AO 91 (Rev. 11/11) Criminal Complaint                                                    AUSA Matthew Skiba (312) 353-3148

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JUAN BOOKER

CASE NUMBER: 26 CR 59

**FILED**
**2/12/2026**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about February 11, 2026, at Justice, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a) | knowingly and intentionally distributed a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

Ricardo Brambila by MV

RICARDO BRAMBILA
Task Force Officer, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: February 12, 2026

*Judge's signature*

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**<u>AFFIDAVIT</u>**

I, RICARDO BRAMBILA, being duly sworn, state as follows:

1.      I am a Task Force Officer with the Drug Enforcement Administration. I have been so employed since approximately January 2023. I am currently assigned to the DEA Chicago Field Division, and my responsibilities include the investigation of narcotics trafficking. I am also a police officer with the Hickory Hills Police Department and have been so employed since February 2019. Prior to my position as a TFO with the DEA and a police officer with the Hickory Hills Police Department, I was employed as a police officer with the Orland Park Police Department from April of 2016 to January of 2017. I was concurrently employed with both the Steger and Momence Police Departments from approximately July 2017 until January 2019.

2.      This affidavit is submitted in support of a criminal complaint alleging that Juan BOOKER has violated Title 21, United States Code, Section 841(a) (distribution of a controlled substance).  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging BOOKER with the distribution of a mixture and substance containing 40 grams or more of fentanyl, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on, among other things: (a) my personal knowledge of the facts and circumstances of this investigation described below; (b) information provided by other law enforcement officers, (c) information obtained by witnesses, including a confidential source working for the DEA; (d) consensually-recorded communications and meetings; (e) the results of physical surveillance conducted by law enforcement; (f) the results of laboratory analysis; and (g) my training and experience and the training and experience of other law enforcement officers involved in this investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

4.      In summary and as detailed below, on four occasions between on or about January 14, 2026, and on or about February 11, 2026, law enforcement conducted controlled narcotics purchases from an individual identified as JUAN BOOKER. All four transactions were coordinated by a confidential law enforcement source ("CS-1"),[1] who identified BOOKER as a distributor of narcotics. For each transaction, CS-1 met BOOKER in the lobby of the apartment building where BOOKER resides, and CS-1 provided Official Advanced Funds ("OAF") in exchange for narcotics. Laboratory testing has confirmed that for each transaction, the

---

[1] CS-1 has been a confidential source since approximately December 2024. CS-1 has participated in approximately eight controlled purchases of narcotics for the DEA, resulting in the seizure of narcotics, identification of narcotics dealers, and a federal arrest. CS-1 is receiving monetary compensation for his/her cooperation and has been paid approximately $2,750 to date. CS-1 has seven prior arrests and one conviction. There are no pending cases against him. CS-1 is an admitted prior user of narcotics, including fentanyl. The information provided by CS-1 is reliable because it has been corroborated by surveillance, audio and video recordings, and other information described in this affidavit.

substance BOOKER provided to CS-1 contained fentanyl. In the final transaction on or about February 11, 2026, in particular, BOOKER provided CS-1 with 149 zip-lock baggies that contained approximately 51.5 grams of a substance containing fentanyl.

**A.      CS-1 Identifies Juan BOOKER as a Distributor of Narcotics.**

5.      In and around January 2026, law enforcement spoke with CS-1 regarding narcotics trafficking activities of a person CS-1 identified as Juan "Solo" BOOKER. Specifically, according to CS-1, BOOKER sold CS-1 fentanyl/carfentanil in approximately January 2025. CS-1 offered law enforcement to conduct controlled purchases of narcotics from BOOKER in the future.

6.      CS-1 provided law enforcement with the Facebook profile of "DonJuan Booker," and said that it belonged to the individual CS-1 knew as Juan "Solo" BOOKER. According to Illinois Secretary of State records, the driver's license photo of Juan BOOKER matches the Facebook profile of "DonJuan Booker."

 

**Driver's License Photograph**      **Facebook Profile Picture**

3

7. Based on both the driver's license photograph and Facebook profile picture, I confirmed that the individual who sold narcotics to CS-1 in January and February 2026—as set forth below—is Juan BOOKER.

8. According to CS-1, CS-1 and BOOKER conducted previous narcotics transactions in the lobby of an apartment building at the 8000 block of S. 86th Avenue, in Justice, Illinois. According to CS-1, BOOKER lives in an apartment on the 2nd Floor of the building but is unaware of the specific apartment number. According to records obtained from the management company of the that building, BOOKER and Individual A are the sole listed occupants of Apartment 210 (the "Subject Premises").

9. According to a law enforcement database, BOOKER and Individual A are relatives with one degree of separation. Based on their identifying information, including their respective ages, I believe that BOOKER and Individual A are brothers. I have reviewed the driver's license photograph of Individual A and confirmed that Individual A was not the person who conducted the narcotics transactions with CS-1 in January and February 2026.

**B. BOOKER Sold CS-1 Approximately Seven Grams of Fentanyl in the Lobby of the Subject Premises on January 14, 2026.**

10. On or about January 13, 2026, CS-1 made an unrecorded call to BOOKER—which CS-1 reported to law enforcement on that same date—at phone number (312) XXX-7141, which according to CS-1, was a previous number he used to

4

contact BOOKER.[2] According to CS-1, BOOKER provided CS-1 with a new number, (708) XXX-2878 ("the Subject Phone") for CS-1 to contact BOOKER.[3] According to CS-1, CS-1 ordered $400 worth of "soft" from BOOKER. According to CS-1, CS-1 used the term "soft" in previous transactions with BOOKER for heroin mixed with fentanyl/carfentanil. According to my training and experience, I am aware that the term "soft" can be used as a street name for opioids like heroin, fentanyl, and carfentanil.

11. On or about January 14, 2026, at approximately 12:59 p.m., at the direction of law enforcement, CS-1 made a recorded call to BOOKER on the Subject Phone. During that call, CS-1 told BOOKER that CS-1 would arrive at the apartment building where the Subject Premises is located in approximately 40 minutes.

12. An undercover officer ("UC-1") then drove CS-1 to the Subject Premises' apartment building in an Under Cover Vehicle ("UCV"). Before his arrival, law enforcement searched CS-1 for contraband and excess currency and found none. Law enforcement also equipped CS-1 with a covert audio and video-recording device attached to his clothing. Law enforcement provided CS-1 with $400 in Official Advanced Funds ("OAF") for the transaction with BOOKER.

13. Law enforcement maintained surveillance of the Subject Premises building from the time CS-1 made the call to BOOKER until the transaction was

---

[2] Although law enforcement instructed CS-1 to record any phone calls with BOOKER, I believe that the failure to record this call was an inadvertent mistake rather than the product of any deception.

[3] Law enforcement is awaiting subscriber information for the Subject Phone.

completed. Law enforcement did not observe BOOKER leave the Subject Premises building or witness anyone drop anything off.

14. At approximately 1:55 p.m., CS-1 placed a recorded call to BOOKER on the Subject Phone and said that CS-1 would be arriving within minutes. The covert recording device captures CS-1 walking into the lobby of the apartment building where the Subject Premises is located at approximately 2:01 p.m. Video from the covert recording device shows BOOKER walking down from the second story, opening the door for CS-1, and conversing with CS-1, as shown below:



15. Because of the placement of the covert recording device, the video did not capture the exchange of narcotics and OAF between BOOKER and CS-1. However, in context, it is clear that one takes place. The video shows CS-1 stating, "Appreciate it," in apparent gratitude for receiving narcotics in exchange for OAF.

16.     Law enforcement observed CS-1 exit the Subject Premises, and CS-1 provided law enforcement with zip-lock baggies that CS-1 obtained from BOOKER. According to CS-1, BOOKER provided him with the zip-lock baggies in exchange for $400 in OAF. According to testing from the DEA laboratory, the baggies (shown below) that CS-1 obtained from BOOKER contained a net weight of approximately seven grams of a substance containing fentanyl, heroin, diphenhydramine, xylazine, and acetaminophen.



**C.     BOOKER Sold CS-1 Approximately 18 grams of Fentanyl in the Lobby of the Subject Premises on January 21, 2026.**

17.     On or about January 21, 2026, at the direction of law enforcement, CS-1 made a recorded call to BOOKER on the Subject Phone requesting to meet at approximately 3:00 p.m., to get $800 worth of "soft [narcotics]," to which BOOKER responded, "alright."[4]

---

[4] Throughout this affidavit, I describe various conversations that were recorded. These descriptions often include my understanding of what is being said during such conversations in brackets or otherwise. My understanding and interpretation of the conversations is based

18. UC-1 transported CS-1 to the Subject Premises. Before his arrival at the Subject Premises, law enforcement searched CS-1 for contraband and excess currency and found none. Law enforcement again equipped CS-1 with a covert audio- and video-recording device attached to his clothing. Law enforcement provided CS-1 with $800 in OAF for the transaction with BOOKER.

19. The covert recording device captured CS-1 placing a recorded call to BOOKER on the Subject Phone to tell BOOKER that CS-1 had arrived. The covert recording device captured CS-1 walk into the lobby of the apartment building where the Subject Premises is located at approximately 3:01 p.m.

20. Law enforcement maintained surveillance of the Subject Premises building from the time CS-1 made the call to BOOKER until the transaction was completed. Law enforcement did not observe BOOKER leave the Subject Premises building or witness anyone drop anything off.

21. Video from the covert recording device on CS-1's clothing shows BOOKER walk down from the second story and open the door to the Subject Premises' apartment building before conversing with CS-1, as shown below:

---

on (i) the content and context of the conversations, (ii) my experience and my fellow agents' experiences as law enforcement officers, including our experience observing written conversations as a whole, and (iii) the investigation to date. The summaries of the recorded conversations set forth in this affidavit are based on draft—not final—transcriptions. Finally, the summaries contained herein do not include all potentially criminal communications recorded, or topics covered during the course of the recorded conversations



22.     Because of the placement of the covert recording device, the video did not capture the hand exchange of narcotics and OAF between BOOKER and CS-1. However, the video shows CS-1 following BOOKER into the lobby of the building. CS-1 walks past BOOKER and stops just in front of BOOKER. CS-1 then turns back to face BOOKER briefly before saying, "Appreciate it," in apparent gratitude for receiving narcotics in exchange for OAF. The covert video further shows CS-1 exit the apartment building of the Subject Premises.

23.     Immediately following the transaction, CS-1 provided law enforcement with zip-lock baggies that CS-1 obtained from BOOKER. According to CS-1, BOOKER provided him with the zip-lock baggies in exchange for $800 in OAF. According to testing from the DEA laboratory, the baggies (shown below) that CS-1 obtained from BOOKER contained a net weight of approximately 18 grams of a substance containing fentanyl, diphenhydramine, phenacetin, acetaminophen, and quinine.

9



**D.      BOOKER Sold CS-1 Approximately 23 Grams of Fentanyl in the Lobby of the Subject Premises on February 2, 2026.**

24.      On or about February 2, 2026, at the law enforcement, CS-1 made a recorded call to BOOKER on the Subject Phone. CS-1 asked BOOKER whether CS-1 could obtain "1200," to which BOOKER responded that he only had "800" ready. In context, given that CS-1 subsequently obtained narcotics from BOOKER in exchange for $800 in OAF, I believe that the context makes clear that BOOKER and CS-1 are discussing the pricing for narcotics.

25.      UC-1 transported CS-1 to the apartment building where the Subject Premises is located. Before his arrival at the Subject Premises, law enforcement searched CS-1 for contraband and excess currency and found none. Law enforcement again equipped CS-1 with a covert audio and video-recording device attached to his clothing. Law enforcement provided BOOKER with $800 in United States currency for the transaction.

26.      According to video from the covert recording device, CS-1 placed a call to BOOKER on the Subject Phone to let BOOKER know that CS-1 arrived. The video

further shows that CS-1 entered the entrance to the apartment building where the Subject Premises is located at approximately 2:47 p.m.

27.     At approximately 2:46 p.m., an undercover officer ("UC-2") entered the apartment building and surveilled the door to the Subject Premises. At approximately 2:50 p.m., UC-2 observed BOOKER exit the Subject Premises and walk out of view.[5]

28.     According to the covert recording device on CS-1's clothing, BOOKER walked down the stairs from the second floor and met CS-1 in the lobby, as shown below:



29.     Due to the placement of the covert recording device, the video did not capture the hand exchange of narcotics and OAF. However, in the video, BOOKER extends his left arm while looking downward, consistent with BOOKER handing an item to the CS-1. The CS-1 then thanks BOOKER and tells BOOKER that CS-1 will

---

[5] UC-2 recognized BOOKER from a known photograph obtained by the Illinois Secretary of State database.

call at a later time. The CS-1 departs the North Entrance Lobby and exits out the East door of the building where the Subject Premises is located.

30.     Immediately following the transaction, CS-1 provided law enforcement with 60 zip lock baggies that contained approximately 23 grams of suspected narcotics. Preliminary field testing revealed that the substance (shown below) tested inconclusive for narcotics according to the TruNarc handheld narcotics analyzer. However, testing by the DEA laboratory on or about February 9, 2026 revealed that the substance contains fentanyl.[6] A DEA laboratory report confirming the net weight and purity of the substance, as well as any additional substances contained within the baggies, is not yet complete.



**E.      BOOKER Sold CS-1 Approximately 51.5 Grams of Fentanyl in the Lobby of the Subject Premises on February 11, 2026.**

31.     On or about February 10, 2026, in the presence of law enforcement, CS-1 placed a recorded call to BOOKER on the Subject Phone. During this call, CS-1

---

[6] In my training and experience, the TruNarc handheld narcotics analyzer often produces inconclusive results for fentanyl.

asked for $1,800 worth of "soft [narcotics]." BOOKER agreed to provide the amount that CS-1 requested. During the call, BOOKER also asked CS-1 whether CS-1 was with someone else and was on speakerphone. CS-1 replied that he/she was with an individual who would be financing part of the transaction. A law enforcement officer ("UC-3") posed as a narcotics buyer. BOOKER asked what CS-1 and UC-3 were doing with all of "it," and stated, "you ain't trying to kill yourself? I don't want you to kill yourself." CS-1 stated that UC-3 planned to "get off some" and "hustle [sell]" the rest. BOOKER subsequently concluded the call by stating he would "make it happen."

32.   On or about February 11, 2026, an undercover officer ("UC-4") transported CS-1 to the apartment building where the Subject Premises is located. Before his arrival at the Subject Premises' building, law enforcement searched CS-1 for contraband and excess currency and found none. Law Enforcement again equipped CS-1 with a covert audio- and video-recording device attached to his clothing. Law enforcement provided CS-1 with $1,800 in United States Currency for the transaction with BOOKER.

33.   The video from the covert recording device shows that CS-1 called BOOKER on the Subject Phone to tell BOOKER that CS-1 was arriving. The video further shows that CS-1 entered the entrance to the apartment building where the Subject Premises is located at approximately 1:20 p.m.

34.   According to the covert recording device on CS-1's clothing, BOOKER was waiting on the first floor in the lobby of the Subject Premises' building. Due to the placement of the covert recording device, the video did not capture the entire hand

exchange of narcotics and OAF. However, the video shows that BOOKER reached inside his left jacket pocket and appeared to pull out an item and hand it to CS-1. The video further shows CS-1 thanking BOOKER. The video further shows CS-1 depart the North Entrance lobby and exit out the East door of the Subject Premises' building.

35. Immediately following the transaction, CS-1 provided law enforcement with approximately 149 zip lock baggies that contained approximately 51.5 grams of suspected narcotics that CS-1 said he/she obtained from BOOKER. Preliminary field testing by the DEA laboratory revealed that the substance contains fentanyl. A DEA laboratory report confirming the net weight and purity of the substance, as well as any additional substances contained within the baggies, is not yet complete.

**F.      BOOKER's Arrest and Search of the Subject Premises.**

36. On February 11, 2026, at approximately 3:50 p.m., Magistrate Judge Maria Valdez authorized a search warrant to search the Subject Premises and containers within (26 M 85). At approximately 5:15 p.m. on February 11, 2026, law enforcement knocked on the Subject Premises' door. An individual—the voice of whom I recognized to be BOOKER's—asked who it was, and law enforcement announced their presence and that they were there to execute a search warrant.

37. Law enforcement then heard movement coming from inside the Subject Premises. After BOOKER did not come to the door for an inordinate amount of time, law enforcement entered the apartment and witnessed BOOKER run to the bathroom and lock himself inside while yelling, "he's got a gun!" Law enforcement, believing BOOKER to be armed and barricaded, asked BOOKER to exit the bathroom. Law

14

enforcement heard the toilet flushing before BOOKER opened the bathroom door and surrendered. Law enforcement arrested BOOKER, entered the bathroom, and observed four open baggies on the ground and residue on both the toilet and the bathroom floor that, according to field testing, tested positive for the presence of cocaine.

38. During the search of the Subject Premises, law enforcement recovered:

a. Approximately 69 gross grams of suspected fentanyl, with laboratory testing pending;

b. Approximately 29 gross grams of suspected crack cocaine, with laboratory testing pending;

c. Approximately 500 gross grams of suspected cannabis; and

d. Drug paraphernalia, including scales and drug packaging similar to the baggies that BOOKER provided to CS-1 during the transaction on or about February 11, 2026.

39. During a search incident to arrest of BOOKER, law enforcement recovered approximately $2,900 in United States currency, including the $1,800 of OAF that CS-1 provided to BOOKER in exchange for narcotics during the transaction on or about February 11, 2026.

## CONCLUSION

40. Based on the foregoing, I respectfully submit that there is probable cause to believe that, on or about February 11, 2026 at Justice, in the Northern District of Illinois, Eastern Division, JUAN BOOKER did knowingly and intentionally distribute a controlled substance, namely, 40 grams or more of a quantity of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

Ricardo Brambila by MV
_____
RICARDO BRAMBILA
Task Force Officer, Drug Enforcement Administration


SWORN TO AND AFFIRMED by telephone February 12, 2026.

_____
Honorable MARIA VALDEZ
United States Magistrate Judge

16